# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| CHRISTINA D. ROEDESHIMER, | CASE NO. 1:23-CV-01085-PAG |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Christina Roedeshimer challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 30, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated May 30, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Roedeshimer filed for DIB and SSI on August 17, 2018, alleging a disability onset date of June 1, 2017. (Tr. 195, 197). The claims were denied initially and on reconsideration. (Tr. 73-92, 95-116). Ms. Roedeshimer then requested a hearing before an Administrative Law Judge. (Tr. 133-34). Ms. Roedeshimer (represented by counsel) and a vocational expert (VE) testified at the initial hearing before the ALJ on November 22, 2019. (Tr. 30-72). On January 24, 2020, the ALJ

issued a written decision finding Ms. Roedeshimer not disabled. (Tr. 7-23). The Appeals Council

denied Ms. Roedeshimer's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Thereafter,

Ms. Roedeshimer timely filed an action in federal court, and the parties jointly stipulated to

remand the matter to the Commissioner pursuant to Sentence Four of Section 205 of the Social

Security Act, 42 U.S.C. § 405(g). (Tr. 1563-65).

After remand, the ALJ held a second hearing on January 26, 2023. (Tr. 1508-46). The ALJ

issued another unfavorable decision on February 15, 2023. (Tr. 1461-1507). Ms. Roedeshimer

thereafter timely appealed to this Court on May 30, 2023. (ECF #1; *see also* 20 C.F.R. § 404.984).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Roedeshimer was 35 years old on the alleged onset date, making her a younger

individual age 18-49 under the regulations. (Tr. 1497). She has a limited education and has

worked as a cashier, cashier checker, fast food worker, dietary aide, and porter. (Tr. 1496-97).

### II. Relevant Medical Evidence

As a child, Ms. Roedeshimer was diagnosed with intermittent explosive disorder in partial

remission and polysubstance abuse; post-traumatic stress disorder (PTSD) and dysthymia were both

ruled out. (Tr. 1350).

On August 14 and September 12, 2017, Ms. Roedeshimer met with Lindsey Kershaw,

CNP, for medication management. (Tr. 1162). Her mental status examination was within normal

limits. (Tr. 1164-65, 1175-76). NP Kershaw continued Seroquel and recommended Ms.

Roedeshimer begin individual therapy. (Tr. 1166, 1177).

On October 27, 2017, Ms. Roedeshimer treated with a behavioral health provider at Recovery Resources (RR), and discussed medication compliance, sleeping habits, and Ms. Roedeshimer being recently fired from her fast-food job. (Tr. 1059). She was diagnosed with bipolar disorder, unspecified. (*Id.*).

On October 30, 2017, Ms. Roedeshimer presented to the emergency department complaining of severe depression. (Tr. 331). Her history was noted as significant for bipolar disorder and PTSD. (*Id.*). She had recently discovered she was pregnant, was about eight weeks along, and had been off her lithium for about four weeks but was continuing to take her other medications including Seroquel and gabapentin. (*Id.*). She had been sober for the past three months. (*Id.*). She was becoming more and more depressed, despite seeing her psychiatrist at RR. (*Id.*). Ms. Roedeshimer wished for medication adjustment because she felt she could not wait until her next appointment. (Tr. 334). She was told that medication adjustments were not possible in the emergency department, provided additional resources, and discharged with instructions to return if her symptoms worsened. (*Id.*).

On November 20, 2017, Ms. Roedeshimer treated with RR behavioral health counseling as referred from her RR psychiatrist. (Tr. 1035). Her mental status examination was normal. (Tr. 1045-46). She reported being sober for 16 months. (Tr. 1046). She was recommended to continue engaging in behavioral health counseling as well as community psychiatric support treatment (CPST). (*Id.*).

On December 18, 2017, Ms. Roedeshimer presented to CSU Frontline Service complaining of anxiety, depression, and hopelessness, and that her boyfriend beat her the day before. (Tr. 1011). She reported being sober for 18 months. (*Id.*). She was admitted for treatment

of her PTSD but later discharged on her request after she stated she felt she could keep herself safe at home. (*Id.*). Ms. Roedeshimer reported feelings of worthlessness, depression, and trauma; she was recommended behavioral health and medication management services from CSU. (Tr. 1018).

On March 6, 2018, Ms. Roedeshimer met with NP Kershaw for medication management and reported doing well, seeing a therapist regularly, and that she was six months pregnant. (Tr. 1229-30). Her mental status examination was within normal limits. (Tr. 1231-32). NP Kershaw noted Ms. Roedeshimer was relatively stable, decreased Seroquel and continued her other medications, with instruction to follow up with her OB/GYN. (Tr. 1234). On May 11, 2018, Ms. Roedeshimer reported improvement in her mood since starting Latuda through her OB/GYN's office. (Tr. 1254). NP Kershaw continued her medications. (*Id.*).

On July 17, 2018, Ms. Roedeshimer reported increased fatigue, anxiety and poor concentration and memory to NP Kershaw, who surmised the issues may be related to decreased sleep due to caretaking for her newborn. (Tr. 1291). Her mental status examination was within normal limits. (Tr. 1290-91). NP Kershaw increased Seroquel and continued all other medications. (Tr. 1291).

On August 31, 2018, Ms. Roedeshimer had been treating with RR due to her dual diagnosis including PTSD, depression, and past drug use, but was discharged from counseling due to loss of contact. (Tr. 1025, 1027-28).

On September 12, 2018, Ms. Roedeshimer treated at RR with Lindsey Kershaw, CNP, for medication management. (Tr. 1312-17). She reported worsening concentration and described a time she went to the store in boxer briefs because she forgot to put on her pants. (Tr. 1312). On examination, she was oriented in all spheres, had normal concentration and intact memory, rapid

speech, and appropriate affect, with irritable and anxious mood. (Tr. 1314-15). She admitted she felt Effexor made things worse and agreed that lithium had helped her mood and focus. (Tr. 1316). Effexor was discontinued, lithium started, and all other medications continued. (*Id.*).

On November 5, 2018, Ms. Roedeshimer's mental status examination was within normal limits, although she reported some increased anxiety and irritability. (Tr. 1321-23). NP Kershaw decreased Seroquel, continued gabapentin and Wellbutrin XL, and increased lithium to 300 mg. (Tr. 1323).

On March 4, 2019, Ms. Roedeshimer treated with NP Kershaw for medication management. (Tr. 1390). She reported weight gain, worsening depression, anxiety, and paranoia. (*Id.*). She moved into a new house and worried that people were looking through her windows. (*Id.*). She remained sober, but her weight gain induced thoughts of relapse to lose the weight. (*Id.*). She kept up with her cleaning, laundry, caring for her son, and cooking. (*Id.*). On examination, Ms. Roedeshimer was oriented, with no evidence of delusions or perceptual disturbance, but paranoid thoughts at night; she had racing thoughts and anxious mood. (Tr. 1392). NP Kershaw decreased Seroquel to 25 mg at bedtime, or as needed for agitation or irritability, increased gabapentin to 600 mg, and continued Wellbutrin and lithium. (Tr. 1393). She referred Ms. Roedeshimer for individual therapy and diet/exercise groups. (*Id.*).

On April 4, 2019, Ms. Roedeshimer again met with NP Kershaw for medication management. (Tr. 1399). She had self-discontinued Seroquel for the past month. (Tr. 1402). She reported her anxiety was worse and she was experiencing racing thoughts/worry, she had stopped driving, and she took an Uber to the appointment. (*Id.*). She reported feeling more paranoid and described feelings of people looking in her windows or hearing footsteps walking behind her since

stopping Seroquel. (*Id.*). She had only left her home to attend an AA meeting in the last month. (*Id.*). She had run out of lithium two days before. (*Id.*). On examination, Ms. Roedeshimer was oriented in all spheres, had no evidence of delusions or perceptual disturbance, but paranoid thoughts at night; sustained attention and concentration, good judgment and insight; she had racing thoughts and anxious mood. (Tr. 1401). Her lithium panel was cancelled due to being off lithium. (Tr. 1402). NP Kershaw discontinued lithium and Seroquel, started Geodon and melatonin, and continued gabapentin and Wellbutrin with instruction for follow up in two weeks for medication tolerance and symptom review. (*Id.*).

On May 2, 2019, Ms. Roedeshimer followed up with NP Kershaw and reported not doing well, with increased depression and "very high" anxiety causing her to scratch/itch herself. (Tr. 1408). She reported hearing a mumbling/laughing voice outside her head at night when she is alone, a male voice inside her head, and sometimes seeing faces in her windows. (*Id.*). The Geodon made her more anxious; she was back on 50 mg Seroquel at bedtime and continued Wellbutrin and gabapentin. (*Id.*). On examination, she was oriented in all spheres, with no evidence of delusions but did have paranoid thoughts at night, cognitive distortions, poor self-esteem, and reported audio and visual hallucinations. (Tr. 1411). She had sustained attention and concentration, anxious mood, and full affect. (*Id.*). NP Kershaw indicated probable borderline personality disorder in addition to her diagnoses of bipolar disorder, PTSD, and opioid dependence/cocaine use in sustained remission. (*Id.*). NP Kershaw recommended Ms. Roedeshimer have an updated behavioral health assessment to manage her symptoms of anxiety and thoughts of relapse. (*Id.*). NP Kershaw decreased Seroquel, started Abilify, discontinued melatonin per request, and continued gabapentin and Wellbutrin at current dosages. (Tr. 1412).

On May 30, 2019, Ms. Roedeshimer met with NP Kershaw for medication management and reported she was doing okay and liked the medication changes, although she had some worsening of her depression symptoms the last week. (Tr. 1418). She reported worry-related paranoia and that she heard one male voice in her head daily telling her she is worthless. (*Id.*). She felt her symptoms had improved since starting Abilify. (Tr. 1421). NP Kershaw decreased Seroquel to 25 mg and titrated up on Abilify for mood/psychosis and continued all other medications. (*Id.*).

Ms. Roedeshimer treated with NP Kershaw on July 18, 2019 with little change in her symptoms. (Tr. 1427-35). NP Kershaw increased the dosage of Seroquel with instructions to increase as needed for anxiety, continued gabapentin and Wellbutrin, discontinued Abilify, and started Latuda. (Tr. 1431).

On August 13, 2019, Ms. Roedeshimer reported to NP Kershaw that her medications have helped a little and her moods were a little more stable; her fears and worry were slightly decreased. (Tr. 1437). Latuda was titrated up, Seroquel was decreased to one tab, and Wellbutrin and gabapentin were continued. (Tr. 1440). NP Kershaw planned to discontinue Seroquel if Ms. Roedeshimer was successful on Latuda. (*Id.*).

On September 12, 2019, Ms. Roedeshimer reported to NP Kershaw that she was experiencing some nausea that may be related to the Latuda, but that she was less anxious and was sleeping nine hours at night and wished to continue Latuda even if it was causing her nausea. (Tr. 1451). Her paranoia was improved and she had no issues with visual or auditory hallucinations. (*Id.*). She was looking for jobs, attending AA meetings on Sundays, and had attended a family event and a festival. (*Id.*). Her mental status examination was normal, she was oriented in all spheres with euthymic mood, sustained attention and concentration, and full affect congruent

with mood. (Tr. 1453). NP Kershaw tapered Seroquel and continued all other medications. (Tr. 1454).

On February 10, 2020, Ms. Roedeshimer was transferred from Metrohealth Recovery Services to medication maintenance with a note that she had engaged intermittently in case management services to support her recovery and stability goals but had remained consistent with medication management and doctor appointments. (Tr. 1897).

On September 29, 2020, Ms. Roedeshimer met with NP Kershaw and reported doing well; she had gone camping with her boyfriend and son, was walking daily, doing chores, and caring for their son. (Tr. 1929). She reported her mental health was the same and denied any issues with depression, anxiety, agitation, irritability, or psychotic symptoms. (*Id.*). She was taking her medications but had discontinued individual therapy. (Tr. 1930). NP Kershaw continued Ms. Roedeshimer's medications. (Tr. 1933).

On August 2, 2021, Ms. Roedeshimer presented for a mental health assessment with Zachary Pichler, LPCC. (Tr. 2791-2807). Mr. Pichler assessed Ms. Roedeshimer as presenting in a calm and cooperative manner, she did not endorse any hallucinations, delusions, perceptions, thought difficulties, or homicidal or suicidal ideations. (Tr. 2806-07). He determined she met the criteria for bipolar disorder. (Tr. 2807). He recommended she attend RR to address ongoing mental health concerns associated with her bipolar disorder. (*Id.*).

On October 28, 2021, Ms. Roedeshimer attended behavioral health services with Charles Andrzejewski, LSW, complaining of exacerbated anxiety due to moving to a new residence and a panic attack a few weeks before. (Tr. 2828). On examination she had anxious mood, circumstantial association, and fair judgment and insight; all other areas were within normal limits. (*Id.*).

### III.     Medical Opinions

On October 29, 2018, state agency reviewing psychologist Vicki Warren, Ph.D., found Ms. Roedeshimer had no limitations in her ability to understand, remember, or apply information, mild limitations in her ability to adapt or manage herself, and moderate limitations in her ability to interact with others and concentrate, persist, or maintain pace. (Tr. 77-78). She found Ms. Roedeshimer was limited to work in settings without fast pace or pressure deadlines. (Tr. 80).

At reconsideration on January 11, 2019, state agency reviewing psychologist Leslie Rudy, Ph.D., found Ms. Roedeshimer had no limitations in her ability to understand, remember, or apply information, and moderate limitations in her ability to adapt or manage herself, interact with others and concentrate, persist, or maintain pace. (Tr. 100). She also found Ms. Roedeshimer was limited to work in settings without fast pace or pressure deadlines, could interact on an occasional basis with the public and appropriately with familiar others, and her stress tolerance was limited but she could adapt to occasional changes with some supervisory support. (Tr. 102-03).

On November 6, 2020, state agency reviewing psychologist Vicki Warren, Ph.D., found Ms. Roedeshimer had no limitations in her ability to understand, remember, or apply information, and moderate limitations in her ability to adapt or manage herself, interact with others, and concentrate, persistent, or maintain pace. (Tr. 1551). Dr. Warren also found Ms. Roedeshimer could perform short repetitive one- to four-step tasks in a setting with a flexible pace and production requirements, engage in superficial social interactions in the work setting, and adapt to a routine work setting where changes are infrequent. (Tr. 1553-54).

On October 29, 2021, state agency psychologist Casey Sharp, Psy.D., found Ms. Roedeshimer had mild limitations in her ability to understand, remember, or apply information,

and moderate limitations in her ability to adapt or manage herself, interact with others, and concentrate, persistent, or maintain pace. (Tr. 1570). Dr. Sharp also found Ms. Roedeshimer could carry out and maintain pace for one- to two-step repetitive tasks, work in a non-customer service type setting with limited interaction with coworkers and the public and adapt to a setting in which duties are routine and predictable. (Tr. 1573-74).

On March 2, 2022, state agency reviewing psychologist Paul Tangeman, Ph.D., affirmed Dr. Sharp's findings. (Tr. 1610, 1613).

On November 8, 2019, NP Kershaw completed a mental impairment questionnaire. (Tr. 1459-60). She noted she had treated Ms. Roedeshimer since October of 2015 at one- to three-month intervals for bipolar disorder, PTSD, and probable borderline personality disorder. (Tr. 1459). She described Ms. Roedeshimer as having good judgment/insight, fluctuating mood/anxiety, racing thoughts, and poor concentration with increased anxiety symptoms. (*Id.*). Her prognosis was fair to good with medication management and therapy. (*Id.*). NP Kershaw completed a checkbox form indicating Ms. Roedeshimer was generally seriously limited but not precluded in the areas of sustained concentration and persistence and understanding and memory but did not indicate further limitations, was generally seriously limited but not precluded in the area of social interaction, with an inability to meet competitive standards in accepting instruction or criticism, and was limited but satisfactory in her ability to adapt. (Tr. 1460-61).

On October 15, 2021, Ms. Roedeshimer attended a psychological evaluation with Evelyn Rivera, Ph.D. (Tr. 2645-49). Dr. Rivera summarized Ms. Roedeshimer's history, including diagnoses of bipolar disorder and unspecified anxiety disorder; ruled out generalized anxiety disorder and panic disorder; and five years' sobriety from heroin. (Tr. 2648). Ms. Roedeshimer

reported receiving mental health treatment at RR and taking gabapentin, quetiapine, bupropion, and Latuda. (*Id.*). She reported getting manic energy often and is anxious daily, especially when in public. (*Id.*). Ms. Roedeshimer stated she fears ghosts and sometimes feels she sees them in the house, but Dr. Rivera observed she did not appear to be actively hallucinating during the interview. (*Id.*).

In the functional assessment for understanding, remembering, and carrying out instructions, Dr. Rivera noted Ms. Roedeshimer had difficulty doing serial sevens and became visibly stressed when counting backwards; Ms. Roedeshimer reported a history of learning difficulties. (Tr. 2649). With respect to maintaining attention and concentration, and maintaining persistence and pace to perform simple or multi-step tasks, Ms. Roedeshimer had difficulty focusing her attention during serial sevens and was visibly distressed when unable to do it. (*Id.*). In responding appropriately to work pressures and to supervision and coworkers in a work setting, Dr. Rivera reported Ms. Roedeshimer's depressed mood, mood swings manic energy, social anxiety and limited coping skills would affect her ability to respond appropriately in a work setting. (*Id.*).

On January 3, 2023, Christopher Macias, LSW, completed a mental health questionnaire describing that he met with Ms. Roedeshimer every two to three weeks via telehealth since December 2, 2021. (Tr. 2891). He stated she has consistently demonstrated severe social anxiety, avoids public settings, and avoids in-person medical/counseling appointments due to heightened physiological and psychological symptoms. (*Id.*). In one instance, she had an in-person appointment but left a session before the end due to severe anxiety. (*Id.*). Mr. Macias opined Ms. Roedeshimer was seriously limited but not precluded from performing most areas of mental functioning, including carrying out very short and simple instructions, performing activities within

11

a schedule, working with others without distraction, remembering locations and procedures, interacting with the public and others, responding appropriately to changes, and being award of hazards. (Tr. 2891-92). He also opined she was unable to meet competitive standards in her ability to manage regular attendance, complete a normal workday and workweek without interruptions from her psychologically based symptoms, and her ability to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). He anticipated Ms. Roedeshimer would miss work five to eight days per month and be off-task three hours per day due to symptoms. (Tr. 2892-93).

## IV.    Administrative Hearing

Ms. Roedeshimer testified at a second hearing before the ALJ on January 26, 2023 that she lives with her son's father and their four-year-old son. (Tr. 1515). She completed the eighth grade and had attempted and failed the GED twice. (Tr. 1516). She does not drive; her son's father drives her to all appointments. (*Id.*). She can clean and do laundry, but he shops, cooks dinner, and does the yard work. (Tr. 1525). He cooks dinner for their son; she cannot cook because she cannot follow directions but will feed their son snacks during the day while her boyfriend is at work. (Tr. 1526, 1530). She usually takes the bus because she is afraid of other cars on the road but will sometimes drive to the corner store close to her; it had been three years since she had been on a freeway. (Tr. 1517). She was not working. (*Id.*). She used to volunteer to sponsor other girls in Alcoholics Anonymous but had not done that for about three years. (*Id.*). She received assistance with healthcare but no other public benefits; her son's father supported her with side jobs. (Tr. 1517-18).

She described a typical day consisting of waking around 9:00 a.m. with her son, watching cartoons with him, taking him to the bus stop down the driveway from her house, returning to straighten up around the home until her son and boyfriend return home around 2:00 p.m.; she watches cartoons with her son while her boyfriend cooks dinner; she then retires to bed around 8:30 p.m. with her son. (Tr. 1526-27). She described her son having meltdowns during the day, which give her anxiety, so she goes upstairs to her room and calms down before returning to care for him. (Tr. 1526-27).

She last worked in 2017 at Chipotle and a short time at Olive Garden. (Tr. 1518). The ALJ reviewed the past relevant work from the previous hearing and determined she had past relevant work as a Cashier, Fast Food Worker, Line Cook, Porter, and Diet Aide. (Tr. 1518-21).

Ms. Roedeshimer testified she was could not to work because she has a lot of anxiety and panics when she is around people. (Tr. 1522). She stated she was very nervous at the hearing, that her head was empty, and she did not know what to say because she was so nervous. (*Id.*). She does not leave her house and the only people she regularly sees are her son's doctors. (*Id.*). She attends church by watching on her phone. (Tr. 1523-24). She last attended church in person at her mother's funeral in 2019. (Tr. 1524).

She treats her anxiety by taking her medication as prescribed and attending regular monthly or biweekly counseling sessions. (*Id.*). These appointments are also by phone. (Tr. 1525). She felt the therapy sessions were helpful, but she had been waiting two months to see her doctor for medication management. (Tr. 1524-25). She experiences paranoia and feels as if there is something in her house watching her, particularly while showering. (Tr. 1528-29). She isolates within her home and stays to herself, away from her son and boyfriend. (Tr. 1529). She is unable

to sleep through the night and wakes up exhausted the next day. (Tr. 1529-30). She has difficulty concentrating and following directions. (Tr. 1530). She tries to help her son with his preschool homework but she feels as if she cannot do it because the directions are confusing and she has difficulty figuring out what his homework is about. (*Id.*). She has bad days once or twice a week, where she will not get out of bed, shower, or change her clothes. (Tr. 1531). She experiences daily panic attacks with difficulty breathing, swallowing, and chest pain; some have been severe enough to send her to the emergency department. (Tr. 1532-33). She has remained sober since June 3, 2018, with no relapses. (Tr. 1527).

The VE testified that a hypothetical individual with the same age, education, and experience as Ms. Roedeshimer, with residual functional capacity (RFC) limited to perform simple routine tasks, can have occasional interactions with coworkers and the public, and is limited to routine workplace changes, could perform the past work of porter. (Tr. 1538-39). In addition, the individual could perform work as a kitchen worker, laundry worker, and cleaner. (*Id.*). The VE also testified it would be work preclusive if the individual were absent one day per week or off-task three hours per day. (Tr. 1544).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and

416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination
      of impairments, that is "severe," which is defined as one which substantially
      limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform
      past relevant work?

5.    Can claimant do any other work considering her residual functional
      capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f)

and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Roedeshimer had not engaged in substantial gainful

activity since June 1, 2017, the alleged onset date. (Tr. 1467). At Step Two, the ALJ identified the

following severe impairments: affective disorders, including depressive disorder; anxiety disorder;

personality disorder; and PTSD. (*Id.*). At Step Three, the ALJ found Ms. Roedeshimer did not

have an impairment or combination of impairments that meets or medically equals any listed

impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1468). The ALJ considered

mental health Listings 12.04, 12.06, 12.08, and 12.05. (*Id.*). She found that Ms. Roedeshimer

exhibited mild impairment in Paragraph B criteria for understanding, remembering, or applying

information, moderate impairment in interacting with others and concentrating, persisting, or

maintaining pace, and adapting or managing oneself. (Tr. 1468-76).

> After review, the ALJ determined Ms. Roedeshimer's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform a full range of work at all
> exertional levels but with the following nonexertional limitations: limited to
> performing simple, routine tasks; with occasional interactions with co-workers and
> the public; and is limited to routine workplace changes.

(Tr. 1476). At Step Four, the ALJ determined Ms. Roedeshimer had past relevant work as a Porter,

cashier, cashier checker, fast food worker, and dietary aide. (Tr. 1496-97). The ALJ also determined

at Step Five that Ms. Roedeshimer could perform her past relevant work of porter, as well as

perform representative jobs of kitchen helper, laundry laborer, and cleaning. (Tr. 1497-98).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's

findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v.*

*Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

16

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Ms. Roedeshimer presents three issues for review:

1.    Whether the ALJ failed to comply with this Court's remand order by failing to support her findings with substantial evidence;

2.    Whether the ALJ erred by failing to properly evaluate the opinions of the treating and consulting sources in accordance with 20 CFR §§ 404.1520(c) and 416.920(c); and

3.    Whether the ALJ committed harmful error by failing to apply the criteria in SSR 16-3p to Ms. Roedeshimer's symptoms.

(ECF #10, PageID 2936). I address each in turn below.

**I.    The ALJ supported her findings with substantial evidence.**

Ms. Roedeshimer first argues the ALJ's decision post-remand is "still not supported by substantial evidence" and asks this Court to remand again. (ECF #10, PageID 2944). She states: "It is well settled that where a federal district court has reversed the Commissioner's final decision and remanded the case for further proceeding, 'it is the duty of . . . the agency from which appeal is taken . . . to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions.'" (*Id.*) (quoting *Mefford v. Gardner*, 383 F.2d

748, 758 (6th Cir. 1967)). She argues that because the ALJ's decision was not supported by

substantial evidence, it was contrary to this Court's order. (ECF #10, PageID 2945). The

Commissioner does not specifically address this argument, but more generally argues that

substantial evidence supports the ALJ's determination. (*See generally* ECF #13). For the reasons that

follow in this section and in Parts II and III, I find the ALJ has supported her decision with

substantial evidence and I decline to recommend remand.

      As described in the Standard of Review section above, when reviewing the denial of Social

Security benefits, this Court "must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's

findings are conclusive if supported by substantial evidence. *McClanahan*, 474 F.3d at 833. But

even if substantial evidence or indeed a preponderance of the evidence supports a claimant's

position, the reviewing court cannot overturn "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

      Here, this Court's June 25, 2021 remand order was based on a stipulation from the parties

that further administrative proceedings were required. (Tr. 1590). Subsequent to that remand, on

February 23, 2022, the Appeals Council directed the ALJ to "[g]ive further consideration to the

medical source opinion(s) and prior administrative medical findings . . . [g]ive further

consideration to the claimant's maximum residual functional capacity and provide appropriate

rationale with specific references to evidence of record in support of the assessed limitations . . . ."

and "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational

expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . ." (Tr. 1587).

As I discuss in more detail in the appropriate sections below, it appears the ALJ considered the medical opinions and prior administrative medical findings as directed. (Tr. 1484-95). Her analysis spanned several pages, provided headings for each provider opinion and a separate section for agency reviewing opinions, and provided specific reasoning for the weight given to each opinion. (*Id.*). Even though Ms. Roedeshimer may believe the ALJ should have weighed the evidence in her favor, my review of the record confirms the ALJ did not overlook evidence supporting Ms. Roedeshimer's disability claim. The ALJ also considered Ms. Roedeshimer's maximum RFC and again gave specific headings for each relevant consideration as well as sufficient analysis to guide this Court's review. (Tr. 1476-95). Finally, the ALJ conducted a second hearing with Ms. Roedeshimer and obtained VE testimony during that hearing, which she relied on in her decision. (Tr. 1534-44).

I find no reason to recommend remand on this basis.

## II.     The ALJ properly evaluated the opinion evidence.

Ms. Roedeshimer next argues the ALJ did not properly consider the opinion evidence from NP Kershaw, Mr. Macias, Dr. Rivera, and the state agency reviewing physicians. (ECF #10, PageID 2945-54). The Commissioner counters that the ALJ properly considered these opinions in light of the regulations requiring her to articulate her findings in terms of supportability and consistency. (ECF #13, PageID 2974-79).

Because Ms. Roedeshimer filed her application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these revised regulations,

the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b).

The ALJ need not to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(a). An ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ failed to consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Ms. Roedeshimer takes issue with the ALJ's consideration of the medical opinions provided by NP Kershaw, Mr. Macias, Dr. Rivera, and the state agency reviewing physicians. I recount the ALJ's handling of each opinion as follows:

21

*Lindsey Kershaw, CNP*

As for the opinion evidence, the undersigned finds not persuasive, the opinion of the claimant's mental healthcare provider, Lindsey Kershaw, CNP. She opined that the claimant is "unable to meet competitive standards" in accepting instruction and criticism from supervisors; "seriously limited but not precluded" from understand and remembering instructions, interacting appropriately with the public, getting along with others with exhibiting behaviors, maintaining social appropriate behavior, maintaining attention for extend periods, managing regular attendance withing customary tolerances, working in coordination with others without distraction, completing a normal workday/week due to psychological symptoms, and performing at a consistent pace without unreasonable breaks. This opinion is not persuasive because it is not entirely consistent with the claimant's own reported functioning. The claimant reported that she cares for her son; she is able to prepare her own meals regularly; she goes to the home store and Walmart regularly; she is able to get around by driving and walking; she is able to shop for clothes and food, 1-2 times per month; she is able to pay bills, count change, handle a savings account, and use a checkbook/money order; she drives and is able to go out alone for short shopping trips; and she has no bank account, so does not pay bills or handle accounts. She also testified that she attends her son's doctor appointments and she talks to his teachers; she attends AA meetings online due to the lack of having a baby-sitter. She also noted that she has been sober since 2018. In sum, the claimant is living with her significant other, she cares for her son, along with the child's father; she attends medical appointments and school appointments with her son; she is able to handle finances when she has bank accounts; and she is able to go to the store for shorter shopping trips. At exam on September 29, 2020, the claimant reported that she had gone camping over the weekend with her boyfriend and son, and she had fun. Other than that trip, she had been staying at home, going for walks daily to lose weight, doing chores, and caring for her son. She noted that her appetite was good, and she denied any issues with anxiety, depression, agitation, irritability, or other symptoms. This reporting by the claimant does not suggest that she's isolating or has marked/significant difficulty functioning outside of the home. These reports from the claimant do not reflect the degree of limitation opined by Ms. Kershaw. The claimant reported that she is able to pay bills, count change, handle a savings account (if she has money), and use a checkbook/money order. The consultative examining psychologist opined that the claimant is capable of managing her finances. The ability to manage one's own funds effectively, particularly in cases that may involve granting a relatively large sum of money to an individual at one time, requires significant cognitive facilities such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts. In addition, managing one's finances independently requires a level of psychological stability that indicates that an individual will make decisions in their own best interests, which is particularly relevant in a case with allegations of mental impairments. Such activity is inconsistent with serious, marked, or worse mental

22

limitations in any areas of functioning, as opined by Ms. Kershaw. The claimant's mental status examination findings do not support more than a fair or moderate degree of limitation in any areas of mental functioning, which is inconsistent with Ms. Kershaw's opinion. On October 30, 2017, she was fully oriented; she was calm and cooperative; she appeared depressed; and her thought content was intact. A psychology exam that day showed that she was oriented x 3; well groomed; cooperative; her affect was full and appropriate; and her speech and thought content were within normal limits. In December of 2017, she was fully oriented; her behavior was appropriate, purposeful, and responsive, with no abnormalities; her speech was normal as to amount, quality, and organization; her mood was dysphoric; her affect was appropriate; her short- and long-term memory were good; she had good concentration; her judgment was good; and her decision-making was poor (as to her well-being). On August 24, 2018, she was well groomed; she was fully oriented; her language was normal; her attention and concentration were normal; she was fully alert, cooperative, and calm; she was not anxious, angry, agitated, guarded, or hostile; she had no perceptual disturbances; her speech was unremarkable; her short and long term memory were intact; her affect was broad, stable, and appropriate to mood; her judgment and insight were fair; her associations were normal; and her thought content was appropriate. Her exams were substantially similar on 09/12/17, 12/18/17, 03/08/18, 05/10/18, 07/17/18, and 11/05/18. On March 4, 2019, she was well groomed; her behavior was cooperative, anxious, and proper; she was oriented x 3; her speech and perceptions were unremarkable; her thought processes were racing, but goal oriented; her thought content was unremarkable; her mood was anxious; her affect was full; her attention/concentration were sustained; her recent and remote memory were normal; her judgment and insight were good; and her fund of knowledge was good. Her exams were substantially similar, with little variation, on 07/18/19, 01/28/20, 04/28/20, and 06/26/20. At exam on 05/02/18, she was sad, tearful, anxious, and depressed, but generally her exams were more consistent with balance discussed herein. On 07/27/20, her behavior was withdrawn, anxious, but cooperative; her fund of knowledge was poor; her mood was anxious and dysphoric; and her affect was flat; however, generally her exams were more consistent with the other exams discussed in this section of the decision. At exam on September 29, 2020, her behavior was cooperative; she was oriented; her speech was unremarkable; her thought process was goal oriented and logical; her thought content was unremarkable; her mood was euthymic; her attention was sustained; her recent and remote memories were normal; her judgment and insight were good; and her fund of knowledge was good. Her exam was substantially similar on 08/02/21. On October 15, 2021, her grooming was adequate; her speaking was rushed, but her speech was otherwise logical and coherent; her mood was depressed; her energy was hyper/anxious; she was oriented x 3; she had difficulty remembering dates; she was able to spell "world" forwards and backwards; her serial addition was slow but accurate; and she appeared to be functioning the below average intellectual level. On October 18, 2021, her behavior and mood were

anxious; her associations were circumstantial; her judgment and insight were fair; and she was otherwise unremarkable. Her exams were substantially similar, with a dysphoric mood noted at times, on 12/02/21, 02/06/22, 05/11/22, 08/01/22, 10/20/22, and 12/05/22. While these examinations show some degree of impairment, they do not show a marked or serious degree of difficulty in any areas of mental functioning. They do not reflect the degree of mental functional limitation found by Ms. Kershaw. After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultants opined that the claimant has no more than mild limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning. None of the state agency psychological opinions included a marked or worse degree of mental functional limitation, which is inconsistent with Ms. Kershaw's opinion The record supports that the claimant has encountered some degree of loss in the ability to functioning; however, the examination results, the persuasive portions of the medical opinions, and the claimant's reported functioning, are inconsistent with Ms. Kershaw's opinion. For these reasons, and based on this evidence, Ms. Kershaw's opinion is not persuasive.

*Christopher Macias, LSW, January 3, 2023*
The undersigned finds not persuasive the opinion of the claimant's counselor, Christopher Macias, LSW, dated January 3, 2023. He opined that the claimant is seriously limited, but not precluded, from performing most areas of mental functioning, including carrying out very short and simple instructions, performing activities within a schedule, working with others without distraction, remembering locations and procedures, interacting with the public and others, responding appropriately to changes, and being award of hazards; she is "unable to meet competitive standards" as to maintaining attention and concentration for extend periods; she would be absent from work 5-8 days per month; and she would be off-task 3 hours per day. This opinion is not persuasive because it is not supported by the treatment notes, and the evidence generally does not support that the claimant has marked, serious, or otherwise significant limitations in any areas of mental functioning. Mr. Macias is also not an acceptable medical source. Even if Mr. Macias was an acceptable medical source, this opinion is not persuasive because it is not entirely consistent with the claimant's own reported functioning. The claimant reported that she cares for her son; she is able to prepare her own meals regularly; she goes to the home store and Walmart regularly; she is able to get around by driving and walking; she is able to shop for clothes and food, 1-2 times per month; she is able to pay bills, count change, handle a savings account, and use a checkbook/money order; she drives and is able to go out alone for short shopping trips; and she has no bank account, so does not pay bills or handle accounts. She also testified that she attends her son's doctor appointments and she talks to his teachers; she attends AA meetings online due to the lack of having a baby-sitter. These reports do not suggest the inability to attend regularly, remain on task, stay

24

on schedule interact on a functional level with others. In sum, the claimant is living with her significant other, she cares for her son, along with the child's father; she attends medical appointments and school appointments with her son; she is able to handle finances when she has bank accounts; and she is able to go to the store for shorter shopping trips. At exam on September 29, 2020, the claimant reported that she had gone camping over the weekend wither boyfriend and son, and she had fun. Other than that trip, she had been staying at home, going for walks daily to lose weight, doing chores, and caring for her son. She noted that her appetite was good, and she denied any issues with anxiety, depression, agitation, irritability, or other symptoms. This reporting by the claimant does not suggest that she's isolating or has marked/significant difficulty functioning outside of the home. These reports from the claimant do not reflect the degree of limitation opined by Mr. Macias. The claimant reported that she is able to pay bills, count change, handle a savings account (if she has money), and use a checkbook/money order. The consultative examining psychologist opined that the claimant is capable of managing her finances. The ability to manage one's own funds effectively, particularly in cases that may involve granting a relatively large sum of money to an individual at one time, requires significant cognitive facilities such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts. In addition, managing one's finances independently requires a level of psychological stability that indicates that an individual will make decisions in their own best interests, which is particularly relevant in a case with allegations of mental impairments. Such activity is inconsistent with serious, marked, or worse mental limitations in any areas of functioning, as opined by Mr. Macias. The claimant's mental status examination findings do not support more than a fair or moderate degree of limitation in any areas of mental functioning, which is inconsistent with Mr. Macias's opinion. On October 30, 2017, she was fully oriented; she was calm and cooperative; she appeared depressed; and her thought content was intact. A psychology exam that day showed that she was oriented x 3; well groomed; cooperative; her affect was full and appropriate; and her speech and thought content were within normal limits. In December of 2017, she was fully oriented; her behavior was appropriate, purposeful, and responsive, with no abnormalities; her speech was normal as to amount, quality, and organization; her mood was dysphoric; her affect was appropriate; her short- and long-term memory were good; she had good concentration; her judgment was good; and her decision-making was poor (as to her well-being). On August 24, 2018, she was well groomed; she was fully oriented; her language was normal; her attention and concentration were normal; she was fully alert, cooperative, and calm; she was not anxious, angry, agitated, guarded, or hostile; she had no perceptual disturbances; her speech was unremarkable; her short and long term memory were intact; her affect was broad, stable, and appropriate to mood; her judgment and insight were fair; her associations were normal; and her thought content was appropriate. Her exams were substantially similar on 09/12/17, 12/18/17, 03/08/18, 05/10/18, 07/17/18, and 11/05/18.

On March 4, 2019, she was well groomed; her behavior was cooperative, anxious, and proper; she was oriented x 3; her speech and perceptions were unremarkable; her thought processes were racing, but goal oriented; her thought content was unremarkable; her mood was anxious; her affect was full; her attention/concentration were sustained; her recent and remote memory were normal; her judgment and insight were good; and her fund of knowledge was good. Her exams were substantially similar, with little variation, on 07/18/19, 01/28/20, 04/28/20, and 06/26/20. At exam on 05/02/18, she was sad, tearful, anxious, and depressed, but generally her exams were more consistent with balance discussed herein. On 07/27/20, her behavior was withdrawn, anxious, but cooperative; her fund of knowledge was poor; her mood was anxious and dysphoric; and her affect was flat; however, generally her exams were more consistent with the other exams discussed in this section of the decision. At exam on September 29, 2020, her behavior was cooperative; she was oriented; her speech was unremarkable; her thought process was goal oriented and logical; her thought content was unremarkable; her mood was euthymic; her attention was sustained; her recent and remote memories were normal; her judgment and insight were good; and her fund of knowledge was good. Her exam was substantially similar on 08/02/21. On October 15, 2021, her grooming was adequate; her speaking was rushed, but her speech was otherwise logical and coherent; her mood was depressed; her energy was hyper/anxious; she was oriented x 3; she had difficulty remembering dates; she was able to spell "world" forwards and backwards; her serial addition was slow but accurate; and she appeared to be functioning the below average intellectual level. On October 18, 2021, her behavior and mood were anxious; her associations were circumstantial; her judgment and insight were fair; and she was otherwise unremarkable. Her exams were substantially similar, with a dysphoric mood noted at times, on 12/02/21, 02/06/22, 05/11/22, 08/01/22, 10/20/22, and 12/05/22. While these examinations show some degree of impairment, they do not show a marked or serious degree of difficulty in any areas of mental functioning. They do not reflect the degree of mental functional limitation found by Mr. Macias. After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultants opined that the claimant has no more than mild limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning. None of the state agency psychological opinions included a marked or worse degree of mental functional limitation, which is inconsistent with Mr. Macias' opinion. The record supports that the claimant has encountered some degree of loss in the ability to functioning; however, the examination results, the persuasive portions of the medical opinions, and the claimant's reported functioning, are inconsistent with Mr. Macias' opinion. For these reasons, and based on this evidence, Mr. Macias' opinion is not persuasive.

*Evelyn Rivera, Ph.D., dated 10/15/21*

The undersigned finds partially persuasive the opinion of the consultative examining psychologist, Evelyn Rivera, Ph.D., dated 10/15/21. She opined that the claimant is able to manage her own funds; she had some difficulty with remembering dates and details; she had difficulty focusing attention during math calculations; her symptoms impact her ability to respond appropriately to supervision and coworkers; and her symptoms affect her ability to respond appropriately to work pressures. The opinion is not persuasive because it is vague and does not provide any useful gauge for determining the extent of the claimant's mental functional limitations. For example, noting that the claimant's symptoms "impact her ability" to respond to appropriately to others and work pressures, does not provide any specific useful information other than suggesting that there is some degree of limitation in these areas of functioning. Also the portions of the opinion noting that the claimant has "difficulty" in attention and remembering, are vague and do not provide useful evaluation that are stated in programmatic or vocationally relevant terms. The vagueness of these portions of the opinion render them nearly useless, with the exception of suggesting some unspecified degree of limitation. The portion of the opinion concluding that the claimant is able to manage her own funds, at least provides some clear picture of mental functioning. This portion is consistent with the claimant's assertions and examination findings and other persuasive portions of the medical opinions. The claimant reported that she cares for her son; she is able to prepare her own meals regularly; she goes to the home store and Walmart regularly; she is able to get around by driving and walking; she is able to shop for clothes and food, 1-2 times per month; she is able to pay bills, count change, handle a savings account, and use a checkbook/money order; she drives and is able to go out alone for short shopping trips; and she has no bank account, so does not pay bills or handle accounts. She also testified that she attends her son's doctor appointments and she talks to his teachers; she attends AA meetings online due to the lack of having a baby-sitter. These reports do not suggest the inability to attend regularly, remain on task, stay on schedule interact on a functional level with others. In sum, the claimant is living with her significant other, she cares for her son, along with the child's father; she attends medical appointments and school appointments with her son; she is able to handle finances when she has bank accounts; and she is able to go to the store for shorter shopping trips. At exam on September 29, 2020, the claimant reported that she had gone camping over the weekend wither boyfriend and son, and she had fun. Other than that trip, she had been staying at home, going for walks daily to lose weight, doing chores, and caring for her son. She noted that her appetite was good, and she denied any issues with anxiety, depression, agitation, irritability, or other symptoms. This reporting by the claimant does not suggest that she's isolating or has marked/significant difficulty functioning outside of the home. The claimant reported that she is able to pay bills, count change, handle a savings account (if she has money), and use a checkbook/money order. The record does not suggest that she would be unable to do so. Therefore, this portion of Dr. Rivera's opinion is

consistent with the evidence, and therefore, persuasive. The ability to manage one's own funds effectively, particularly in cases that may involve granting a relatively large sum of money to an individual at one time, requires significant cognitive facilities such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts. In addition, managing one's finances independently requires a level of psychological stability that indicates that an individual will make decisions in their own best interests, which is particularly relevant in a case with allegations of mental impairments. Such activity is inconsistent with serious, marked, or worse mental limitations in any areas of functioning, as could be suggested by Dr. Rivera's opinion. Again, his opinion is vague at best. The claimant's mental status examination findings do not support more than a fair or moderate degree of limitation in any areas of mental functioning, which would be inconsistent with an opinion suggesting significant mental functional limitations. On October 30, 2017, she was fully oriented; she was calm and cooperative; she appeared depressed; and her thought content was intact. A psychology exam that day showed that she was oriented x 3; well groomed; cooperative; her affect was full and appropriate; and her speech and thought content were within normal limits. In December of 2017, she was fully oriented; her behavior was appropriate, purposeful, and responsive, with no abnormalities; her speech was normal as to amount, quality, and organization; her mood was dysphoric; her affect was appropriate; her short- and long-term memory were good; she had good concentration; her judgment was good; and her decision-making was poor (as to her well-being). On August 24, 2018, she was well groomed; she was fully oriented; her language was normal; her attention and concentration were normal; she was fully alert, cooperative, and calm; she was not anxious, angry, agitated, guarded, or hostile; she had no perceptual disturbances; her speech was unremarkable; her short and long term memory were intact; her affect was broad, stable, and appropriate to mood; her judgment and insight were fair; her associations were normal; and her thought content was appropriate. Her exams were substantially similar on 09/12/17, 12/18/17, 03/08/18, 05/10/18, 07/17/18, and 11/05/18. On March 4, 2019, she was well groomed; her behavior was cooperative, anxious, and proper; she was oriented x 3; her speech and perceptions were unremarkable; her thought processes were racing, but goal oriented; her thought content was unremarkable; her mood was anxious; her affect was full; her attention/concentration were sustained; her recent and remote memory were normal; her judgment and insight were good; and her fund of knowledge was good. Her exams were substantially similar, with little variation, on 07/18/19, 01/28/20, 04/28/20, and 06/26/20. At exam on 05/02/18, she was sad, tearful, anxious, and depressed, but generally her exams were more consistent with balance discussed herein. On 07/27/20, her behavior was withdrawn, anxious, but cooperative; her fund of knowledge was poor; her mood was anxious and dysphoric; and her affect was flat; however, generally her exams were more consistent with the other exams discussed in this section of the decision. At exam on September 29, 2020, her behavior was cooperative; she was oriented; her speech

was unremarkable; her thought process was goal oriented and logical; her thought content was unremarkable; her mood was euthymic; her attention was sustained; her recent and remote memories were normal; her judgment and insight were good; and her fund of knowledge was good. Her exam was substantially similar on 08/02/21. On October 15, 2021, her grooming was adequate; her speaking was rushed, but her speech was otherwise logical and coherent; her mood was depressed; her energy was hyper/anxious; she was oriented x 3; she had difficulty remembering dates; she was able to spell "world" forwards and backwards; her serial addition was slow but accurate; and she appeared to be functioning the below average intellectual level. On October 18, 2021, her behavior and mood were anxious; her associations were circumstantial; her judgment and insight were fair; and she was otherwise unremarkable. Her exams were substantially similar, with a dysphoric mood noted at times, on 12/02/21, 02/06/22, 05/11/22, 08/01/22, 10/20/22, and 12/05/22. While these examinations show some degree of impairment, they do not show a marked or serious degree of difficulty in any areas of mental functioning. They do not reflect the degree of mental functional limitation, as could be suggested by Dr. Rivera's opinion. Again, his opinion is vague at best. After reviewing the medical evidence of record available to them, including some of the aforementioned mental status examination findings, the state agency psychological consultants opined that the claimant has no more than mild limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning. None of the state agency psychological opinions included a marked or worse degree of mental functional limitation, which is inconsistent with any significant mental functional limitation as could be suggested by Dr. Rivera's opinion. For these reasons, and based on this evidence, Dr. Rivera's opinion is only partially persuasive.

*State Agency Psychological Consultants*
The undersigned finds partially persuasive the opinion of the state agency psychological consultant, Vicki Warren, Ph.D., dated 10/29/18. She opined that the claimant has no limitations in understanding, remembering, or applying information; moderate limitations in interacting with others, concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself. She opined further that the claimant is able to work in settings without fast pace or pressure deadlines. The undersigned finds this opinion partially persuasive because, while the record supports moderate limitation in interacting with others, and with concentrating, persisting, or maintaining pace; the more complete record also supports slight limitations in understanding, remember, and applying information, and moderate limitations in adapting and managing oneself, as is explained above. Moreover, limiting the claimant to "working in settings without fast pace or pressure deadlines" is vague, and not stated in vocationally relevant terms. The undersigned found routine workplace changes and the limitation of performing only simple and routine tasks, more appropriate terminology, based on the record and other opinions. Additionally, the jobs noted at Steps 4 (porter) and

5 (other jobs) of the sequential analysis (See Finding 6), do not require the person be able to perform fast-paced work. Therefore, the jobs identified as consistent with the residual functional capacity finding above, do not require fast-paced work. Even if the undersigned added this specific terminology, it would not change the outcome of this decision. With respect to specific mental functional limitations, the undersigned utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations. While the undersigned did not adopt the state agency psychological consultant's opinions verbatim, the undersigned found the general theme of these specific limitations partially persuasive when formulating the above residual functional capacity assessment. The undersigned finds partially persuasive the opinion of the state agency psychological consultant, Vicki Warren, Ph.D., dated 11/06/20. She opined that the claimant has no limitations in understanding, remembering, or applying information; moderate limitations in the other areas of mental functioning. She opined further that the claimant can perform short repetitive 1-4 step tasks in a setting with flexible pace and production requirements; she can engage in superficial social interactions; and adapt to a routine work setting where change is infrequent. The undersigned finds this opinion partially persuasive because, while the record supports moderate limitations all but one area of mental function, the more complete record also supports slight limitations in understanding, remember, and applying information, as is explained above. While finding these opinions partially persuasive, the undersigned did not adopt the limitation on "superficial" interaction because Dr. Warren did not define this term and it is otherwise vague. The record does not reflect that the claimant would be limited to only "superficial" interaction, as the record includes exam findings. The claimant's mental status examination findings do not support a limitation to "superficial" interactions, to the extent we can decipher this term. On October 30, 2017, she was fully oriented; she was calm and cooperative; and she appeared depressed. A psychology exam that day showed that she was oriented x 3; well groomed; cooperative; her affect was full and appropriate; and her speech and thought content were within normal limits. At an exam in December of 2017, she was fully oriented; her behavior was appropriate, purposeful, and responsive, with no abnormalities; her speech was normal as to amount, quality, and organization; her mood was dysphoric; and her affect was appropriate (as to her well-being). On August 24, 2018, she was well groomed; she was fully oriented; her language was normal; her attention and concentration were normal; she was fully alert, cooperative, and calm; she was not anxious, angry, agitated, guarded, or hostile; she had no perceptual disturbances; and her speech was unremarkable. Her exams were substantially similar on 09/12/17, 12/18/17, 03/08/18, 05/10/18, 07/17/18, and 11/05/18. On March 4, 2019, she was well groomed; her behavior was cooperative, anxious, and proper; she was oriented x 3; her speech and perceptions were unremarkable; her mood was anxious; her affect was full; and her attention/concentration were sustained. Her exams were substantially similar, with little variation, on 07/18/19, 01/28/20, 04/28/20, and 06/26/20. At exam on 05/02/18, she was sad, tearful, anxious, and

depressed, but generally her exams were more consistent with balance discussed herein. On 07/27/20, her behavior was withdrawn, anxious, but cooperative; her affect was flat; however, generally her exams were more consistent with the other exams discussed in this section of the decision. On September 29, 2020, her behavior was cooperative; she was oriented; her speech was unremarkable; her mood was euthymic; and her attention was sustained. Her exam was substantially similar on 08/02/21. On October 15, 2021, her grooming was adequate; her speaking was rushed, but her speech was otherwise logical and coherent; her mood was depressed; and her energy was hyper/anxious. On October 18, 2021, her behavior and mood were anxious; her associations were circumstantial; and she was otherwise unremarkable. Her exams were substantially similar, with a dysphoric mood noted at times, on 12/02/21, 02/06/22, 05/11/22, 08/01/22, 10/20/22, and 12/05/22. While these examinations show that the claimant's mental impairments impact the ability to interact with others to some degree, they do not suggest she'd be limited to "superficial interactions". The claimant did not present with significant difficulties interacting with counsel or the undersigned during the hearing. The record does not reflect that the claimant had significant deficits interacting with medical care providers. This evidence does not suggest that the claimant is limited to no more than "superficial" interactions. Also, the other mental limitations set forth in the residual functional capacity assessment adequately limit the nature of mental demands the claimant would be performing when interacting with others, by limiting the nature of tasks to simple and routine, and within the context of routine workplace changes. As such, limiting the frequency of contact, within the context of the other mental functional limitations, adequately accounts for the claimant's limitations in this regard. Moreover, a review of the job descriptions for the jobs (step 4 and/or 5) in the DOT/SCO, does not reflect that such job(s) include any degree of intensity of contact that one may characterize as greater than "superficial". Therefore, while the undersigned assigned the aforementioned persuasiveness, the undersigned did not adopt all limitations. While the undersigned did not adopt the state agency psychological consultant's opinions verbatim, the undersigned found the general theme of these specific limitations partially persuasive when formulating the above residual functional capacity assessment. For these reasons, and based on this evidence, the undersigned finds this opinion partially persuasive. The undersigned finds partially persuasive the opinion of the state agency psychological consultant, Leslie Rudy, Ph.D., dated 1/11/19. She opined that the claimant has no limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning. She opined further that the claimant is able to work in settings without fast pace or pressure deadlines; and her stress tolerance is limited, such that she can adapt to occasional changes with some supervisory support. The undersigned finds this opinion partially persuasive because, while the record supports moderate limitations all but one area of mental function, the more complete record also supports slight limitations in understanding, remember, and applying information, as is explained above. The portion noting that the claimant

can "adapt to occasional changes with some supervisory support" appears to refer to the claimant's ability to tolerate changes in the workplace, and use of the term "some supervisory support" is vague. The undersigned has included only "occasional workplace changes" and left out "with some supervisory support" because this terminology is not explained. Use of the term "some" is not explained or otherwise quantified in vocationally relevant terms. The term is too vague. No other reviewing medical source provided such a limitation, thereby making it inconsistent with other medical opinions. The residual functional capacity finding above includes additional limitations not found by Dr. Rudy, including limiting the claimant to "simple, routine tasks". This limitation reflects the claimant's moderate limitations in concentration, persistence, maintaining pace, and adapting and managing. Consequently, Dr. Rudy also found these degrees of limitation. By reducing the complexity of the task and making any such tasks routine, the residual functional capacity assessment adequately accounts for the potential need for "some supervisory support". Additionally, limiting the claimant to "working in settings without fast pace or pressure deadlines" is vague, and not stated in vocationally relevant terms. The undersigned found routine workplace changes and the limitation of performing only simple and routine tasks, more appropriate terminology. Additionally, the jobs noted at Steps 4 (porter) and 5 (other jobs) of the sequential analysis (See Finding 6), do not require the person be able to perform fast-paced work. Therefore, the jobs identified as consistent with the residual functional capacity finding above, do not require fast-paced work. Even if the undersigned added this specific terminology, it would not change the outcome of this decision. With respect to specific mental functional limitations, the undersigned utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations. While the undersigned did not adopt the state agency psychological consultant's opinions verbatim, the undersigned found the general theme of these specific limitations partially persuasive when formulating the above residual functional capacity assessment. For these reasons, and based on this evidence, the undersigned finds this opinion partially persuasive. The undersigned finds partially persuasive the opinions of the state agency psychological consultants, Casey Sharp, Psy.D. dated 01/26/21, and Paul Tangeman. They opined that the claimant has mild limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning. They opined further that the claimant retains the capacity to understand, remember, and carry out short and simple routine tasks, with superficial contact with others, and can adapt to gradual changes in the workplace. The undersigned finds this opinion partially persuasive because the record supports mild limitations in understanding, remembering, or applying information; and moderate limitations in the other areas of mental functioning, as explained above. The specific mental functional limitations that the claimant "retains the capacity to understand, remember, and carry out short and simple routine tasks" are inconsistent with "mild" limitations in understanding, remembering, and carrying out tasks, as found by Dr. Sharp. The undersigned has

included the substantial equivalent of "limited to performing simple routine tasks", and this limitation reflects moderate limitations in concentrating, persisting, or maintaining pace, and adopting or managing oneself. While finding these opinions partially persuasive, the undersigned did not adopt the limitation on "superficial" interaction because the doctors did not define this term and it is otherwise vague. The record does not reflect that the claimant would be limited to only "superficial" interaction. The record does not reflect that the claimant would be limited to only "superficial" interaction, as the record includes exam findings. The claimant's mental status examination findings do not support a limitation to "superficial" interactions, to the extent we can decipher this term. On October 30, 2017, she was fully oriented; she was calm and cooperative; and she appeared depressed. A psychology exam that day showed that she was oriented x 3; well groomed; cooperative; her affect was full and appropriate; and her speech and thought content were within normal limits. At an exam in December of 2017, she was fully oriented; her behavior was appropriate, purposeful, and responsive, with no abnormalities; her speech was normal as to amount, quality, and organization; her mood was dysphoric; and her affect was appropriate (as to her well-being). On August 24, 2018, she was well groomed; she was fully oriented; her language was normal; her attention and concentration were normal; she was fully alert, cooperative, and calm; she was not anxious, angry, agitated, guarded, or hostile; she had no perceptual disturbances; and her speech was unremarkable. Her exams were substantially similar on 09/12/17, 12/18/17, 03/08/18, 05/10/18, 07/17/18, and 11/05/18. On March 4, 2019, she was well groomed; her behavior was cooperative, anxious, and proper; she was oriented x 3; her speech and perceptions were unremarkable; her mood was anxious; her affect was full; and her attention/concentration were sustained. Her exams were substantially similar, with little variation, on 07/18/19, 01/28/20, 04/28/20, and 06/26/20. At exam on 05/02/18, she was sad, tearful, anxious, and depressed, but generally her exams were more consistent with balance discussed herein. On 07/27/20, her behavior was withdrawn, anxious, but cooperative; her affect was flat; however, generally her exams were more consistent with the other exams discussed in this section of the decision. On September 29, 2020, her behavior was cooperative; she was oriented; her speech was unremarkable; her mood was euthymic; and her attention was sustained. Her exam was substantially similar on 08/02/21. On October 15, 2021, her grooming was adequate; her speaking was rushed, but her speech was otherwise logical and coherent; her mood was depressed; and her energy was hyper/anxious. On October 18, 2021, her behavior and mood were anxious; her associations were circumstantial; and she was otherwise unremarkable. Her exams were substantially similar, with a dysphoric mood noted at times, on 12/02/21, 02/06/22, 05/11/22, 08/01/22, 10/20/22, and 12/05/22. The claimant did not present with significant difficulties interacting with counsel or the undersigned during the hearing. The record does not reflect that the claimant had significant deficits interacting with medical care providers. This evidence does not suggest that the claimant is limited to no more than "superficial" interactions. Also, the other mental limitations set

forth in the residual functional capacity assessment adequately limit the nature of mental demands the claimant would be performing when interacting with others, by limiting the nature of tasks (fill in here). As such, limiting the frequency of contact, within the context of the other mental functional limitations, adequately accounts for the claimant's limitations in this regard. Moreover, a review of the job descriptions for the jobs (step 4 and/or 5) in the DOT/SCO, does not reflect that such job(s) include any degree of intensity of contact that one my characterize as greater than "superficial". Therefore, while the undersigned assigned the aforementioned persuasiveness, the undersigned did not adopt all limitations. While the undersigned did not adopt the state agency psychological consultant's opinions verbatim, the undersigned found the general theme of these specific limitations partially persuasive when formulating the above residual functional capacity assessment. As to the remaining portions of Dr. Sharp's opinion, they are substantially similar to the residual functional capacity assessment above, and they are supported by the supporting evidence discussed above. For these reasons, and based on this evidence, the undersigned finds this opinion partially persuasive.

(Tr. 1484-95) (citations omitted).

In her initial brief before this Court, Ms. Roedeshimer does not argue the ALJ failed to articulate her reasoning in terms of "supportability" and "consistency." (*See* ECF #10, PageID 2945-54). Rather, she argues the ALJ's consideration of these opinions was against the record evidence. (*Id.*). But her reply brief states simply: "the ALJ failed to discuss and consider the factors of supportability and/or consistency." (ECF #14, PageID 2986). Ms. Roedeshimer does not further expand on the supportability and consistency factors in her reply brief. (*See* ECF #14).

I find the ALJ's opinion, which I have quoted at length to evidence the detailed nature of the ALJ's reasoning, provides the requisite analysis of the medical opinions in terms of supportability and consistency. Despite Ms. Roedeshimer's contentions, the ALJ's consideration of the medical opinions is not contrary to the record evidence or unsupported by substantial evidence. At bottom, it appears Ms. Roedeshimer seeks to have this Court reweigh the evidence in her favor, something that is not allowed. *See Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 465

(6th Cir. 2004) ("We may not reweigh conflicting evidence on appeal, but instead must affirm [the ALJ's] decision because substantial evidence supports it.").

I find no error with the ALJ's consideration of the medical opinion evidence and therefore decline to recommend remand on this basis.

### III.    The ALJ properly applied the SSR 16-3p criteria to Ms. Roedeshimer's case.

Finally, Ms. Roedeshimer argues she met the criteria in SSR 16-3p because "she had symptoms affecting her ability to interact with others and maintain attention and concentration. These problems interfered with her ability to complete her activities of daily living." (ECF #10, PageID 2958). The Commissioner contends substantial evidence supports the ALJ's determination and counters Ms. Roedeshimer's argument with other record evidence demonstrating her symptoms were not as severe as alleged. (ECF #13, PageID 2981-83). In short, the Commissioner states, Ms. Roedeshimer's "symptom evaluation argument is nothing more than a request for this Court to try the case de novo." (*Id.* at PageID 2981).

An ALJ must follow a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-

medical evidence, the ALJ considers the entire case record, including the objective medical evidence; the individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. § 404.1529(c)(3) to evaluate the individual's statements:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

4. Factors that precipitate and aggravate the symptoms;

5. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

6. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

7. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

8. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ is not required to analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ need not accept the claimant's subjective complaints and may discount subjective testimony if the ALJ finds those complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ may not reject an individual's statements about her symptoms solely because the objective medical evidence does not substantiate the degree of

36

impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. § 404.1529(c)(2); *see also* SSR 16-3p, 2017 WL 5180304 at *6.

The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ's evaluation must be limited "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id.* at *11. The ALJ need not use any "magic words," so long as the decision as a whole makes clear why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ provided the following analysis of Ms. Roedeshimer's symptoms:

*Allegations*
The claimant reported difficulty with anxiety; focusing when around others; remembering; isolating most of the time; neglecting self-care; difficulty getting along with others, remembering, completing tasks, concentrating, understanding, handling changes in routine, and following instructions; she interacts with her sponsor once a week; and her mental health medication side effects include drowsiness, weight gain, and issues with speech. She noted that she can follow spoken instructions fine unless there are too many, but later noting "not well". She reported losing jobs due to issues interacting with management.

She also reported that she cares for her son; she is able to prepare her own meals regularly; she goes to the home store and Walmart regularly; she is able to get around by driving and walking; she is able to shop for clothes and food, 1-2 times per month; she is able to pay bills, count change, handle a savings account, and use a checkbook/money order; she drives and is able to go out alone for short shopping trips; and she has no bank account, so does not pay bills or handle accounts.

The claimant testified that she lives with her son's father and her son; her son's father has been taking care of her; she does not drive; she is driven by her mother; she usually takes the bus; she hasn't driven more than to the corner store in a while, due to fear of cars and panic attacks; she has not attended AA in three years or so; she has not worked since the prior hearing; she is disabled due to severe anxiety; she is not able to be around others; she has difficulty thinking when nervous; she isolates; she is paranoid; and she has issues with eating and sleeping. She also noted that she attends her son's doctor appointments and she talks to his teachers; she attends AA meetings online due to the lack of having a baby-sitter; and her son has autism resulting in breakdowns when she is in public, which limits her ability to be in public. She also noted that she has been sober since 2018. Her reports to the consultative examiner were substantially similar to her testimony.

The undersigned also reviewed the claimant's testimony from the prior hearing held on November 22, 2019. The balance of her testimony was otherwise substantially consistent with her disability reports. The undersigned also considered the layperson statement of Michael Willett, which is substantially consistent with the claimant's testimony.

At the hearing, the claimant's representative noted that the claimant has additional diagnoses, including bipolar/affective disorder, generalized anxiety disorder, post-traumatic stress disorder, panic disorder, and personality disorder. He argued that she is disabled due to the high level of care she requires. He relied on the opinion of Dr. Rivera to support disability; and he argued that the claimant would have issues with sustaining employment.

The undersigned considered the arguments of the claimant's representative from the hearing and as set forth in Exhibit 20E; however, for the reasons explained in this decision, the representative's arguments are not persuasive.
. . .

In this case, although the medical evidence documented the existence of impairments that could reasonably be expected to produce a certain degree of symptoms, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration or severity as to reduce the claimant's residual functional capacity or to preclude all work activity on a

continuing and regular basis. Bearing this in mind, the undersigned finds that restricting the claimant to performing the range of work described above adequately addresses the location, duration, frequency, and intensity of the claimant's alleged symptoms as well as precipitating and aggravating factors. The claimant's testimony and allegations are not entirely consistent with the record as a whole.

(Tr. 1477-78) (citations omitted). Continuing, the ALJ explained her analysis of this evidence:

*Allegation Analysis*
After careful consideration, the undersigned finds that the claimant's allegations are not entirely consistent with the evidence of record. The claimant's allegations of disabling mental functional limitations are not entirely consistent with the evidence of record. The claimant's reported daily functioning does not support a marked, serious, or worse degree of limitation in by areas of mental functioning. The claimant reported difficulty with anxiety; focusing when around others; remembering; isolating most of the time; neglecting self-care; difficulty getting along with others, remembering, completing tasks, concentrating, understanding, handling changes in routine, and following instructions; she interacts with her sponsor once a week; and her mental health medication side effects include drowsiness, weight gain, and issues with speech. She also noted that she can follow spoken instructions fine unless there are too many, but later noting "not well". The claimant testified that she lives with her son's father and her son; her son's father has been taking care of her; she does not drive; she is driven by her mother; she usually takes the bus; she hasn't driven more than to the corner store in a while, due to fear of cars and panic attacks; she has not attended AA in three years or so; she has not worked since the prior hearing; she is not able to be around others; she has difficulty thinking when nervous; she isolates; she is paranoid; and she has issues with eating and sleeping. While her allegation suggest significant mental functional limitations, they are not entirely consistent with the examination findings and her other reported activities.

She also reported that she cares for her son; she is able to prepare her own meals regularly; she goes to the home store and Walmart regularly; she is able to get around by driving and walking; she is able to shop for clothes and food, 1-2 times per month; she is able to pay bills, count change, handle a savings account, and use a checkbook/money order; she drives and is able to go out alone for short shopping trips; and she has no bank account, so does not pay bills or handle accounts. She also testified that she attends her son's doctor appointments and she talks to his teachers; she attends AA meetings online due to the lack of having a baby-sitter. She also noted that she has been sober since 2018.

In sum, the claimant is living with her significant other, she cares for her son, along with the child's father; she attends medical appointments and school appointments with her son; she is able to handle finances when she has bank accounts; and she is able to go to the store for shorter shopping trips. At exam on September 29, 2020, the claimant reported that she had gone camping over the weekend with her boyfriend and son, and she had fun. Other than that trip, she had been staying at home, going for walks daily to lose weight, doing chores, and caring for her son. She noted that her appetite was good, and she denied any issues with anxiety, depression, agitation, irritability, or other symptoms. This reporting by the claimant does not suggest that she's isolating or has marked/significant difficulty functioning outside of the home.

The claimant reported that she is able to pay bills, count change, handle a savings account (if she has money), and use a checkbook/money order. The consultative examining psychologist opined that the claimant is capable of managing her finances. The ability to manage one's own funds effectively, particularly in cases that may involve granting a relatively large sum of money to an individual at one time, requires significant cognitive facilities such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts. In addition, managing one's finances independently requires a level of psychological stability that indicates that an individual will make decisions in their own best interests, which is particularly relevant in a case with allegations of mental impairments. Such activity is inconsistent with serious, marked, or worse mental limitations in these areas of functioning.

(Tr. 1480-81) (citations omitted). Finally, the ALJ explained her reasoning when forming the RFC and how she incorporated Ms. Roedeshimer's symptom allegations into her RFC determination:

*Summary of the Residual Functional Capacity Finding*
In construing the evidence in the claimant's favor, while also exercising an abundance of caution, the undersigned finds that the claimant retains the mental abilities as set forth in the above residual functional capacity assessment. The symptoms and effects of treatment related to the claimant's mental impairments, support limiting the complexity and routine nature of tasks, workplace changes, and the frequency of interactions with others, as noted above. The portion of the residual functional capacity assessment noting that the claimant is "limited to simple, routine tasks" reflects her limitations in the ability to concentrate, persist, and maintain pace. By limiting the complexity of the tasks and making them routine, it is intended to reduce the mental demands of the claimant with respect to her ability to concentrate, persist, and maintain pace, in the context of symptoms and effects of treatment related to her mental impairments. This limitation is not intended to reflect a limitation as to the claimant's ability to understand,

40

remember, or apply information. This residual functional capacity finding is supported by, and consistent with, the evidence of record, including the medical evidence, examination findings, the persuasive portions of the medical opinions of record, and the claimant's allegations consistent with the medical evidence. This finding reasonably accommodates the physical and mental limitations the claimant experiences from impairments.

(Tr. 1483-84).

In sum, the ALJ thoroughly considered Ms. Roedeshimer's complaints of her mental health symptoms, articulated these findings in a manner sufficient to guide this Court's subsequent review, and crafted an RFC that accommodates the complained-of limitations that were supported by the record evidence. I find nothing to support a conclusion that the ALJ failed to consider the evidence appropriately or that she misconstrued the evidence.

I note also that the ALJ's consideration of Ms. Roedeshimer's hearing testimony is not inconsistent with reports she made to her providers as reflected elsewhere in the record. Although Ms. Roedeshimer alleges her mental health impairments are of disabling severity, there are counterpoints within the record evidence that support the ALJ's findings. I provide a brief comparison to demonstrate substantial evidence supporting the ALJ's finding that Ms. Roedeshimer's allegations were not entirely consistent with the evidence of record:

| Isolating | <ul><li>After self-discontinuing Seroquel and running out of lithium, Ms. Roedeshimer had increased anxiety and was isolating. However, she attended an in-person AA meeting that month. (Tr. 1402).</li><li>When on Latuda, her symptoms improved and she was looking for jobs, attending AA meetings weekly, had attended a family event and a festival. (Tr. 1451).</li></ul> |
|---|---|
| Caring for herself | <ul><li>She reported to NP Kershaw that she was able to keep up with cleaning, laundry, caring for her soon, and cooking. (Tr. 1390).</li><li>She reported doing well on her medications and was walking daily, doing chores, and caring for her son. (Tr. 1928).</li></ul> |

41

| Social anxiety | • She had stopped driving and reported taking an Uber to an appointment in a period where she self-discontinued Seroquel and had run out of lithium (Tr. 1402). However, she continued to drive to the corner store for some shopping trips. (Tr. 1517).<br>• When she was on Latuda, she was looking for jobs, attending AA meetings weekly, and attended a family event and a festival. (Tr. 1451).<br>• When she was doing well with her medication management, she went on a camping trip with her boyfriend and son. (Tr. 1929). |
| --- | --- |
| Remembering, completing tasks, concentrating, understanding, and following instructions | • Dr. Rivera noted Ms. Roedeshimer had difficulty concentrating and completing tasks such as serial sevens during her examination. However, during the examination Ms. Roedeshimer also explained that she had learning difficulties. (Tr. 2649).<br>• On examination, Ms. Roedeshimer exhibited sustained attention and concentration. (Tr. 1453). |
| Medication side effects including drowsiness, weight gain, and speech issues | • Ms. Roedeshimer complained of weight gain and reported to NP Kershaw that she had considered relapsing after noticing a friend had lost 40 pounds after relapse. Even so, she maintained her sobriety. (Tr. 1390).<br>• NP Kershaw referred Ms. Roedeshimer to diet and exercise groups; it is unclear whether Ms. Roedeshimer availed herself of them. (Tr. 1393).<br>• Ms. Roedeshimer reported that she was walking daily. (Tr. 1390).<br>• At a medication management appointment with NP Kershaw, Ms. Roedeshimer complained of fatigue, concentration, and memory issues. NP Kershaw surmised this was due to lack of sleep while caring for her newborn and not related to her mental health condition or medication side effects. (Tr. 1291).<br>• Despite having some nausea on Latuda, Ms. Roedeshimer also reported to NP Kershaw that she appreciated the mental health benefits and did not wish to adjust her medications. (Tr. 1451). |
| Paranoia | • Ms. Roedeshimer reported her paranoia improved while on Latuda. (Tr. 1451).<br>• Ms. Roedeshimer denied psychotic symptoms to NP Kershaw. (Tr. 1929).<br>• On examination, Ms. Roedeshimer did not exhibit auditory or visual hallucinations. (Tr. 1451, 2648, 2806-07). |

Therefore, while Ms. Roedeshimer does have significant mental health symptoms, there is also evidence in the record that calls into question her subjective symptom allegations. I do not find reversible error here. Substantial evidence in the record supports the ALJ's decision;

furthermore, the ALJ's consideration of this evidence receives deference on review. I therefore decline to recommend remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: April 3, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). **Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). **Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at

509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).